Filed 3/3/15  P. v. Sissac CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064910 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE315928) |
| DEMETRIUS SISSAC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

The San Diego County District Attorney charged Demetrius Sissac with first degree, special circumstance murder (Pen. Code, § 187, subd. (a)) in connection with the

October 30, 2011 shooting of taxicab driver Jalaludin Hamrah, alleging that Sissac shot and killed Hamrah with premeditation and deliberation through the intentional and personal use and discharge of a handgun (Pen. Code, § 12022.53, subds. (b), (c), & (d)), while knowing that Hamrah was engaged in the performance of his duties (Pen. Code, § 190.25).

The jury hopelessly deadlocked on the first degree murder charge, and the court dismissed that charge on the prosecution's motion. The jury ultimately found Sissac guilty of second degree murder with true findings on the firearm allegations. The court sentenced him to 15 years to life for the murder conviction, plus 25 years to life for the firearm enhancement under Penal Code section 12022.53, subdivision (d), for a total prison term of 40 years to life.[1]

Sissac appeals, contending that "a series of serious evidentiary errors, primarily arising from the purported records of cell phone activity that the prosecution used to argue that he essentially admitted the crime, both individually and collectively worked to deprive [him] of his fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt."[2] For reasons we shall explain, we reject this contention and affirm the judgment.

---

[1]    The court also imposed 10 years and 20 years, respectively, for the firearm enhancements under Penal Code section 12022.53, subdivisions (b) and (c), but stayed those terms.

[2]    Sissac has filed a petition for a writ of habeas corpus in which he claims he received ineffective assistance of counsel to the extent his trial counsel failed to raise appropriate objections so as to prevent admission of the evidence challenged in this

FACTUAL BACKGROUND

A. *The People's Case*

*The Killing of Hamrah*

Devin Patton, who was also known as "D," was a friend of David Glenn, who was also known as "Jodi" or "Jodi Mack." Glenn introduced Patton to Sissac, whom Glenn knew as "Meech" or "Metrie." Sissac became one of Patton's best friends.

On October 29, 2011, Patton went to a party in El Cajon. While there he and Sissac texted back and forth about the party, and he convinced Sissac to join him. Sissac arrived at the party at around 11:00 p.m. with Glenn, Glenn's cousin, Anthony Roy (Roy, who was also known as "Little Ant"), and an unknown male.[3] After about an hour or an hour and a half, Sissac, Glenn, Roy, and the unknown male left the party. Patton stayed behind.

About 30 minutes later, Patton was told to leave the party. He began walking, hoping to meet up with his friends. Patton eventually met up with the group, and the five men walked to the El Cajon trolley stop and arrived there between 3:00 and 3:30 a.m. The men went to the upstairs trolley platform but the trolleys were not running because it was so late.

---

appeal. This court's decision with respect to Sissac's writ petition is set forth in a separate order.

[3]     Patton, Glenn, and Roy all testified at trial as prosecution witnesses.

The victim in this case, Hamrah, drove a taxi cab. At around 3:30 a.m. on October 30, 2011, Hamrah was the first taxi driver in line waiting for customers at the El Cajon transit station. Sissac approached Habeel Othman, another cab driver who was at the transit station but not in the cab line. Sissac begged Othman for a ride and offered $20, explaining it was all the money his group had.[4] Othman took the money to Hamrah, who was at the front of the cab line. Sissac then managed to obtain a $20 fare for the group to travel to Lemon Grove.[5] Glenn testified that he, Sissac, Patton, Roy, and the other male got into Hamrah's cab. Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat.

Patton testified that, during the taxi ride, Hamrah was making jokes, everyone was "cool," and there was no friction. After what Patton described as a "pleasant" ride, the cab stopped at the Lemon Grove trolley station. The five men got out of the cab and Patton began walking away with Anthony Roy and the unknown male. After a few moments, Patton and Roy heard a loud "pop." Patton, Roy, and the unknown male then took off running. As they were running, Patton asked what had happened and one of the men said, "Meech shot the cab driver." The men ran a few blocks and stopped. Roy was crying, and Patton was confused.

Sissac and Glenn caught up with the other men. Patton testified that Glenn yelled at Sissac, "What the fuck did you do? Why the fuck did you do that?" Patton also

---

[4]     The fare was about $27.

[5]     Glenn testified Sissac said he wanted to "[d]itch a cab," which meant to get in the cab and not pay because they had no money.

testified that Sissac looked at Glenn with a blank look on his face and said the cab driver had laughed or smiled at him.

Glenn, who testified under a grant of use immunity, testified he also heard a gunshot. Glenn testified that he asked Sissac, "What happened? What the fuck did you just do?" Glenn also testified that he "jump[ed] in [Sissac's] face" and told him, "You just smoked the cab driver." Glenn told Sissac they had just come from the El Cajon trolley station, indicated there was video surveillance, and told Sissac that everybody could "go down for this." Sissac replied that since he was "the one that did it, there's no need to take everybody down with [him]." The five men then went home. Glenn testified he had given a .38-caliber gun to Sissac the day before the shooting.

San Diego Sheriff's Detective Barbra Oborski testified that she was driving southbound on Main Street near the Lemon Grove trolley station at about 3:45 a.m. that same morning when she saw a car stopped in the middle of the road. Deputy Oborski stopped to investigate and observed that the car was an upside down taxi cab. The driver, who was later identified as Hamrah, was seat-belted and hanging upside down inside the vehicle, and was unresponsive. Hamrah was having difficulty breathing. Deputy Oborski called for an ambulance.

When paramedics arrived and began rendering aid to Hamrah, they removed his shirt, which exposed a bullet hole in his right upper chest. Hamrah was pronounced dead at 4:11 a.m. The cause of death was a gunshot wound to his chest. The bullet recovered from Hamrah's body was consistent with having been fired from a .38-caliber weapon, although other similar calibers could not be excluded.

5

*Patton's text messages to Sissac, Patton's police interview, and Patton's recorded pretext phone call to Sissac*

Patton testified that at 5:51 a.m. that same morning (October 30) he used his cell phone to text Sissac and told Sissac to turn himself in to the police. Patton also testified that Sissac responded later that he would call back. Patton further testified that he texted Sissac a few minutes later, "You hear what I'm telling you? This is way back." Sissac replied, "I know."[6]

Patton also testified that he texted Sissac that night at 11:03 p.m. and told him to "be a man and own up." At 11:13 p.m., Patton asked Sissac to "[d]o the right thing, please, yo." At midnight, Sissac responded with a text message stating, "You have to pray." Patton testified he did not receive Sissac's text until 9:00 a.m. the next morning (October 31).

Patton also testified that, when it appeared Sissac was not going to turn himself in, he (Patton) left a note for his (Patton's) mother indicating that he needed to talk to her. After Patton told his mother what had happened, she immediately called the police.

During the evening on October 31, Deputy Sheriff Suzanne Fiske learned that a former deputy sheriff, Kim Patton, wished to speak to her. Kim Patton, who is Patton's mother, indicated to Deputy Fiske that Patton had left a note for her. A meeting was set up for Patton to come to the sheriff's department for an interview later that night.

---

6    Additional evidence the prosecution presented at trial regarding text messages that Patton and Sissac sent to each other will be discussed, *post*, in the discussion section of this opinion.

Detectives Palmer and Lebitski interviewed Patton late that night and into the early morning hours of November 1. Patton agreed to participate in a pretext phone call to Sissac.

During his November 1 pretext phone call to Sissac at about 10:42 p.m.—which was recorded, transcribed, and played for the jury—Patton said to Sissac, "To do some shit like that, like that's not my Nigga right there." Sissac responded, "Yeah, it wasn't me. You know? You gotta, you gotta, what you gotta see is *that was the devil . . . ."*[7] (Italics added.)

Following his police interview and his pretext call to Sissac, Patton left town and relocated to the East Coast for his and his family's safety. After the preliminary hearing in this case, the district attorney's office, at the request of Patton's mother, began financially supporting Patton pursuant to their witness relocation program. At the time of trial, Patton had received about $15,922 from this program to pay for his food, rent, and cell phone.

*Additional Evidence*

A San Diego County Sheriff's Department traffic reconstruction expert opined that Hamrah's cab had been going south when it hit a curb, went onto the sidewalk, struck a palm tree, and rolled from the driver's side onto the roof of the cab. (3 RT 279-281.) Inside the cab sheriff's department investigators found a loose $20 bill and Hamrah's cell phone. Cash in the amount of $300 was found in Hamrah's pants pocket.

---

[7] Patton's and Sissac's statements to each other during Patton's recorded pretext call are discussed more fully, *post*, in the discussion section of this opinion.

The prosecution presented evidence showing that Glenn's DNA was found on the back passenger interior door handle of Hamrah's taxi cab. On that date the Lemon Grove trolley stop was monitored by seven cameras. Brown testified that at around 5:30 a.m. that morning she received a phone call from a law enforcement officer regarding a homicide that involved a taxicab driver. The officer requested that she retrieve surveillance video recordings from the El Cajon and Lemon Grove trolley stations that were recorded at around 3:00 a.m. that morning. Brown testified that the surveillance cameras were working that morning, and she obtained the video recordings and gave them to the officer. Brown also testified that she "was able to locate the taxicab at the El Cajon station" and she "able to save that video, along with the individuals who went inside the taxicab."

At trial Patton was shown a still image taken from one of the video recordings at the El Cajon trolley station. Using a pen to identify the men shown in the picture, Patton identified himself, Sissac, Roy, and Glenn, and pointed out the unidentified male who was with them at the station.

One of the video recordings from the El Cajon trolley station was played for Sergeant Henry Lebitski of the San Diego County Sheriff's Department, who testified that Sissac was shown in the video walking down a ramp and speaking with the taxicab drivers.

B. *The Defense*

James Stam, a former San Diego Police Department criminalist, opined that, based upon the amount of gunpowder particles found on the victim and the absence of sooting,

8

the bullet that killed him was fired from three or more feet away. Stam testified he positioned a mannequin in the seat of a similar model vehicle to determine the trajectory of the bullet. Stam opined that it was unlikely, though not impossible, that Hamrah was sitting in a normal driving position facing forward at the time of the shot, while it was "much more likely" that Hamrah was slightly turned around as if talking to someone in the backseat. Stam testified that the trajectory "line[d] up with having been fired from outside the rear door."

## DISCUSSION

## I. *TEXT MESSAGES FOUND ON PATTON'S CELL PHONE*

Sissac contends the court prejudicially erred by admitting evidence of text messages found on Patton's cell phone that he and Patton exchanged with each other after the shooting incident. In support of this contention, he asserts that (1) the prosecution failed to provide an adequate foundation to authenticate the text messages and, thus, failed to "satisfy the authentication and reliability requirements of the business record or past recollection recorded exceptions to the hearsay rule"; (2) "[e]ven if the prosecution laid an adequate foundation," the "purported statements in the text messages" at issue here "were not *direct* accusations that Sissac had shot Hamrah or had committed any other specific crime" and, thus, the statements "were not admissible under the 'adoptive admission' exception to the hearsay rule"; and (3) the "probative value [of the statements] to the question of guilt or innocence was minimal at best given their vague and ambiguous meaning," and, thus, the court should have excluded the evidence of the text

9

messages under Evidence Code[8] section 352 because the probative value of the statements in the text messages was "substantially outweighed by the risk of undue prejudice and confusion of the issues in allowing the prosecution to rely upon them as evidence of Sissac's having effectively admitted that he shot Hamrah."  Sissac's contention and supporting assertions are unavailing because, even if were we to assume the court erred in admitting the text message evidence, any such error was harmless.

A.  *Background*

1.  *Pretrial proceedings*

In its trial brief, the prosecution argued that Sissac's out-of-court statements to Patton were admissible as admissions of a party opponent.

With his own trial brief, Sissac brought a motion in limine seeking to exclude the evidence of text messages between Patton and Sissac that Sheriff personnel downloaded from Patton's cell phone, arguing that the unauthenticated messages lacked proper foundation and they were inadmissible hearsay because they did not constitute admissions by a party opponent.

The prosecution opposed Sissac's in limine motion, asserting that it would provide a sufficient foundation at trial that would authenticate the text messages and allow a jury to conclude that Sissac sent the messages:

> "Upon [his] arrest, [Sissac] was in possession of a cellular telephone, the phone number for that phone is 619-799-3642.  Further, the People expect that Patton will testify as follows:  (1) That the number 619-799-3642 is the number he used to communicate with

---

[8]    All further statutory references are to the Evidence Code.

[Sissac] via cell phone; (2) that number is programmed into his phone with the name 'Meech' or 'Meechie Sissac' . . . attached to it; (3) that he sent the text messages to that number, prompting the responses at issue; ( 4) that the messages were sent soon after the murder; and (5) . . . that he called [Sissac] about six hours after the text message exchange and [Sissac ] answered the phone."

At the hearing on the parties' in limine motions, the court commented that admission of the text messages between Patton and Sissac was subject to a foundation being laid by the person who either sent or received the messages in order to authenticate the messages. The court, however, noted that some of the text messages between Sissac and Patton did not appear to have evidentiary value. The prosecutor responded that the "string of texts" between Sissac and Patton were relevant because it showed the chronology of events and corroborated the testimony of witnesses that Sissac was with the group at a party. The prosecution also argued noted that Sissac's statements were admissible as admissions of a party opponent. The court ruled that if a statement by Sissac in a text message was an admission, "it's admissible."

2. *Trial evidence of text messages*

During trial Patton testified that Sissac, whom he called "Meech," was one of his best friends, and Sissac's contact information was in his (Patton's) cell phone under the name "Meech." Patton testified that he was texting "back and forth" with Sissac while he (Patton) was at the party on the night of the murder. Patton also testified that he texted Sissac after the murder and "asked him to do the right thing and turn himself in." The following exchange occurred between the prosecutor and Patton:

"[Prosecutor]: [W]hen you texted him, what did you text him if you recall?

11

"[Patton]: I asked him to do the right thing. I asked him to man up and I asked him to turn himself in because if he didn't, things were going to get really bad, things like this is what I was saying to him, things like this don't just pass over, this is a sin.

"[Prosecutor]: Now, did you get any response from him at that point?

"[Patton]: No. [Sissac] didn't text me back at that time."

Defense counsel objected to this testimony, arguing the text messages were inadmissible hearsay. The court overruled Sissac's hearsay objection, stating that Patton could testify about what he had said in the text messages.

Patton then testified that Sissac ultimately responded to his texts, but Patton did not get the impression that Sissac was going to turn himself into the police. Patton also testified he later told his mother what had happened, and she called the police.

Shortly thereafter, outside the presence of the jury, defense counsel discussed People's exhibit No. 117, which showed several text messages between Sissac and Patton. Sissac's counsel objected that the evidence was hearsay even if Patton was on the witness stand. The trial court responded, "It is hearsay in the classic sense that it's an out of court statement, but [Patton] can certainly testify as to what he said."

In the presence of the jury, the prosecutor showed Patton People's exhibit No. 116, which depicted a portion of the text messages he and Sissac exchanged on the morning of the crime (Oct. 30, 2011). Patton read the text messages. Patton testified that, in his first text message to Sissac "[he] said, 'Meech, turn yourself in, Meech. This shit is not going to be on my heart. This is crazy, Nigga. I'm so serious.'" The prosecutor then asked

12

Patton, "So you sent that [text message] that morning from your phone, correct?" Patton answered, "Yes, sir." The prosecutor then asked, "To [Sissac's] phone?" Patton replied, "Yes, sir." The prosecutor then asked Patton what was Sissac's response, and Patton responded, "'I'ma call you later.'"

The prosecutor then asked Patton, "[D]id you send [Sissac] another text back a couple [of] minutes later?" Patton replied, "I did, sir." The prosecutor asked Patton what he said in that text, and Patton answered, "I said, 'You hear what I'm telling you? This is way back.'" The prosecutor asked what was Sissac's response, and Patton responded, "'I know.'"

At that point a juror indicated he was unable to see the time of that text indicated on the exhibit, and, at the court's request, the prosecutor then listed all the times of the texts. Defense counsel then stated, "Your Honor, I'm going to object as to lack of foundation for the times." In response, addressing the prosecutor, the court stated, "Well, all right, then, ask the witness, 'Are those the times of those texts?'" The prosecutor complied and asked Patton, "Are those the times of those texts?" Patton answered, "Yes, sir." Following up, the prosecutor asked, Patton, "When you think back, was it early morning, a couple of hours after this incident?" Patton replied, "Yes, sir."

The prosecutor then showed Patton People's exhibit No. 117, which depicted a portion of the text messages exchanged between Patton and Sissac later that evening. Patton confirmed that he sent a text to Sissac at 11:03 p.m. that stated, "Nigga, this ain't cool at all. I can't sleep or nothing. Yo, I didn't even do shit. You need to be a man and own up, Meech."

13

Patton testified he sent another text to Sissac two minutes later that stated, "You ain't thinking about my life, my fam[ily], and this shit hurts like fuck." The prosecutor asked whether he got any response to that text, and Patton answered, "No."

The prosecutor then asked Patton whether he sent another text message to Sissac at 11:13 p.m. that night, and Patton replied, "I did." When asked what he said to Sissac in the text, Patton replied, "'Do the right thing, please, yo.'" Patton testified that he got a response from Sissac at 12:00 a.m. that stated, "You have to pray." Patton also testified that he did not see that response until 9:00 a.m. the next morning. The prosecutor asked Patton, "How did you respond to that?" Patton answered, "I said, 'No, you pray, Nigga. That's some coward ass shit. I got nothing else to say.'"

Later in the trial, Deputy Pearce testified that he downloaded the contents of Patton's phone, the phone number of which was 564-1296. One of the contacts in Patton's phone was Meech (Sissac) with a phone number of 619-799-3642. Deputy Pearce also testified that several phone calls between Patton and Meech were listed in the incoming and outgoing call log of Patton's phone, and there were text messages to and from Meech. He further testified that he downloaded the contents of Sissac's phone that had a phone number of 619-799-3642 and contained a contact for "D" which listed Patton's phone number.

At the close of the prosecution's case-in-chief, the court admitted exhibit Nos. 116 and 117 into evidence without objection.

14

B. *Standard of Review*

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

"The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) A trial court's error under state law in the admission or exclusion of evidence following an exercise of discretion is properly reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203 (*McNeal*).) Under the *Watson* harmless error test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson,* at p. 836.)

C. *Analysis*

We need not and do not reach the merits of Sissac's claim that the court erroneously admitted evidence of text messages (discussed, *ante*) that he and Patton exchanged with each other after the shooting incident because Sissac has not shown and cannot demonstrate that any such error was prejudicial. Assuming without deciding the court abused its discretion in admitting that evidence, and applying the applicable *Watson* harmless error test (*McNeal*, *supra*, 46 Cal.4th at p. 1203), we conclude─in light of the

strong evidence of Sissac's guilt apart from the challenged text message evidence—that Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the admission of the text message evidence.

As discussed more fully, *ante*, a video recording at the El Cajon trolley station shortly before Sissac, Patton, Glenn, Roy, and a fifth male got into Hamrah's taxicab the morning Hamrah was shot showed Sissac speaking to the taxicab drivers there.  This evidence corroborated the testimony of Othman, one of the cab drivers at that station, who testified that a "black young man"[9] approached him with a $20 bill and begged him for a ride at around 3:30 a.m.; that Othman took the money to Hamrah, who was at the front of the cab line; and that the young Black male and four other Black males got into Hamrah's taxicab a few minutes later as shown in a video that was played for Othman.

The prosecution presented evidence that Sissac managed to obtain a $20 fare for the group to travel to Lemon Grove.[10]  Glenn's testimony established that he, Sissac, Patton, Roy, and the other male got into Hamrah's cab.  Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat.

The prosecution also presented testimony—apart from the challenged text message evidence—showing that Sissac made self-incriminating statements.  For example, Patton testified that, after he heard the gunshot, he heard someone say, "Meech [(Sissac)] shot

---

[9]    The record shows Sissac is an African-American who was born in mid-1992 and was 19 years of age at the time of the shooting in late October 2011.

[10]    Glenn testified Sissac said he wanted to "[d]itch a cab," which meant to get in the cab and not pay because they had no money.

16

the cab driver." Patton then testified that Glenn yelled at Sissac, "What the fuck did you do? Why the fuck did you do that?" Patton testified that Sissac looked at Glenn with a blank look on his face and said the cab driver had laughed or smiled at him. Any reasonable jury could find that such a response is an implicit admission demonstrating consciousness of guilt.

The trial record also shows that *before* the prosecutor presented to the jury the contents of exhibits Nos. 116 and 117 depicting various text messages found on Patton's cell phone, Patton testified from his own recollection that he texted Sissac later in the morning, after the shooting of Hamrah, and "asked [Sissac] to do the right thing and turn himself in."

Glenn's testimony placed Sissac in the front passenger seat of Hamrah's taxicab prior to the shooting and established that Sissac admitted to Glenn that he was the shooter. Specifically, Glenn testified that he, Sissac, Patton, Roy, and the fifth male got into the taxicab.[11] Both Patton and Glenn testified that Sissac got into the front seat while the other four sat in the back seat. Glenn testified that, after he heard the gunshot, he asked Sissac, "What happened? What the fuck did you just do?" Glenn further testified that he "jump[ed] in [Sissac's] face" and told him, "You just smoked the cab driver." According to Glenn's testimony, Sissac told him, "Since *I'm the one that did it*, there's no need to take everybody down with me." (Italics added.)

---

[11]     Although Glenn did not identify Hamrah as the driver of the taxicab, an eyewitness—Naseer Yousif, another taxicab driver—testified that he saw five Black individuals get into Hamrah's cab around 3:30 a.m. on October 30, 2011.

17

The trial record also shows that Sissac made self-incriminating statements during Patton's second November 1 pretext phone call to him, which was recorded, transcribed, and played for the jury. Specifically, Patton told Sissac, "*To do some shit like that*, like *that's not my Nigga right there*." (Italics added.) Sissac responded, "*Yeah, it wasn't me*. You know? You gotta, you gotta, what you gotta see is *that was the devil . . . .*" (Italics added.) Patton then asked asked Sissac, "[D]id you . . . [¶] . . . feel like the devil was in you?" Sissac replied, "Yeah. It was, I just—just fuckin' else that would do somethin' like that. *God wouldn't, wouldn't do nothing like that. He wouldn't put that in me. . . .* [¶] . . . [¶] . . . *That was the devil*." (Italics added.) Patton also told Sissac, "[T]*his isn't* [*Sissac*] *that's doin' this. This is . . . somebody else inside of this dude*." (Italics added.) Sissac responded, "*Yeah*. [¶ . . . [¶] . . . I mean it's sad to say this had to happen but it will turn me around, you know, so . . . .*" (Italics added.) Although Sissac challenges the admissibility of this evidence, for reasons we shall explain, *post*, the court did not err in admitting this evidence.

Circumstantial forensic evidence also supported the jury's finding that Sissac fatally shot Hamrah. The prosecution presented evidence establishing that the bullet recovered from Hamrah's body was consistent with having been fired from a .38-caliber weapon. Glenn testified he had given a .38-caliber gun to Sissac the day before the shooting.

In sum, Sissac has failed to meet his burden of showing that any error by the court in admitting evidence of the text messages between Patton and Sissac was prejudicial.

18

## II. *ADDITIONAL CLAIMED ERRORS RESULTING FROM THE CLAIMED ERRONEOUS ADMISSION OF CELL PHONE ACTIVITY*

In a related and somewhat convoluted claim, Sissac asserts that "[t]he prejudicially erroneous admission of the various foundationless, inherently unreliable purported records of cell phone activity led to additional prejudicially erroneous errors; namely, the admission of the evidence that [(1)] Sissac had supposedly 'deleted' the purported text messages between him[self] and [Patton]," which the prosecution "cite[d] . . . as showing consciousness of guilt"; and (2) "that Sissac and Roy had phone contacts after the incident [citations] contrary to Roy's testimony that they did not communicate after the incident [citations]." In his reply brief, Sissac asserts that "the concern is . . . that the evidence was introduced to prove [he] 'deleted' text messages to hide his involvement in the shooting, and that Roy—whose credibility was crucial to the defense since his testimony refuted the notion of Sissac's guilt—was not a believable witness." This, he maintains, "is precisely how the prosecution argued this evidence." Sissac also asserts that "[t]he erroneous admission of these extrapolations and conclusions drawn directly from the erroneously admitted records of cell phone activity could only serve to exacerbate the violation of Sissac's fundamental constitutional rights to due process, a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt." These assertions are unavailing.

### A. *Background*

Deputy Sheriff Daniel Pearce, a member of the computer crimes task force, performed cell phone data extraction using a tool called "Celebrite" on several cell

phones involved in this matter. Deputy Pearce testified that on October 31, 2011, he downloaded the contents of Patton's cell phone, which had a phone number of 564-1296. Without a defense objection, he testified that one of the contacts in Patton's phone was Meech (Sissac) with a phone number of 619-799-3642. Several phone calls between Patton and Meech were listed in the incoming and outgoing call log of Patton's phone. There also were text messages to and from Meech.

Deputy Pearce also testified that on November 15, 2011, he downloaded the contents of Sissac's cell phone which had a phone number of 619-799-3642. Sissac's phone contained contacts for "Little Ant" (Roy), "D" (Patton), and "Jodi" (Glenn). He also testified there were several text messages to and from Sissac on Patton's phone, and these text messages were not on Sissac's phone. The prosecutor then asked Deputy Pearce, "Based on that, what do you attribute that to?" Deputy Pearce replied: "There's only two reasons that text messages really wouldn't be on the phone. One is you have your phone turned off, you didn't use it. In this case, we know it's not true because we have corresponding text messages on Mr. Patton's phone. *The other reason would be that text messages were deleted off the phone*." (Italics added.)

During his closing argument, the prosecutor argued that Sissac "hid the evidence when we're talking about the text messages."

B. *Analysis*

We reach the merits of Sissac's claim of prejudicial error notwithstanding the Attorney General's assertion that Sissac "has forfeited his claim that the phone records

were erroneously admitted" because "[d]efense counsel did not object to Deputy Pearce's testimony regarding the data extraction he conducted from the various cell phones."

With regard to the merits of his claim, Sissac asserts that, apart from the forfeiture issue raised by the Attorney General, "[t]he only real issue[] here" is "whether the erroneous admission of this evidence was prejudicial."

As we did with respect to Sissac's preceding claim that the court erroneously admitted evidence of text messages, we shall assume without deciding that the court abused its discretion in admitting the additional evidence he challenges here and apply the applicable *Watson* harmless error test. (*McNeal*, *supra*, 46 Cal.4th at p. 1203.) We conclude—in light of the strong evidence of Sissac's guilt apart from both the challenged text message evidence and the evidence challenged here—that Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result absent the assumed evidentiary error. In claiming in his opening brief that he suffered prejudice that "served to exacerbate the violation of [his] fundamental constitutional rights," Sissac largely disregards the plethora of strong evidence of his guilt, discussed, *ante*, which we incorporate by reference here.

In his reply brief, Sissac asserts that "[t]he testimony of [Patton] and Glenn—the only witnesses who claimed to have seen or heard [him] incriminate himself in the shooting—was rife with obvious bias and reliability problems." Sissac further asserts that, "[b]esides this testimony of dubious weight and credibility, the only other potential evidence [of his guilt]," other than Deputy Pearce's testimony that he (Sissac) deleted the text messages he and Patton exchanged after the shooting, was the evidence of Patton's

21

pretext call to him.  These assertions are unavailing because it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a credibility determination depends (*People v. Manibusan* (2013) 58 Cal.4th 40, 87), and—again, as we shall explain, *post*—the court properly admitted strong evidence that Sissac made self-incriminating statements during Patton's second November 1 pretext phone call to him.

### III.  *PATTON'S PRETEXT CALL TO SISSAC AFTER THE MURDER*

Sissac next contends the court violated his fundamental constitutional rights to due process, to a fair trial, to confront and cross-examine adverse witnesses, and to a reliable determination of guilt by erroneously admitting evidence of the pretext call that Patton made to him on November 1, 2011, following the killing of Hamrah.  This contention is unavailing.

### A.  *Background*

Prior to trial, in its trial brief, the prosecution argued that Sissac's statements to Patton in two pretext phone calls and a jail phone call were admissible as admissions of a party opponent pursuant to section 1220.  During a pretrial hearing, the prosecution explained that Patton made two pretext phone calls to Sissac, one at 5:45 p.m. on November 1, 2011, and another at 10:42 p.m. that same night.  The prosecution also sought admission of a jail call on November 2, 2011, between Sissac and his mother.  Defense counsel argued the statements in the pretext call were "not true admissions," but conceded they were statements made by a party opponent.

22

The court indicated it would review the transcripts of the phone calls before it determined whether they were admissible. The court later indicated its tentative ruling was that the first pretext phone call and the jail phone call were inadmissible, but the second pretext phone call "has some incriminating language in it and would therefore be admissible." The prosecutor requested that the court listen to the actual recordings of the phone calls before making its rulings. When the trial court asked defense counsel whether he opposed admission of the second pretext phone call, defense counsel responded, "I'm conceding that the [second pretext phone call] has admissions, Your Honor, what could be deemed admissions."

The next day, outside the presence of the jury, the prosecution played the first pretext phone call and the jail phone call for the court. After argument by both counsel,, the trial court reiterated its earlier ruling and excluded the first pretext phone call and the jail call, stating that those conversations "at best, are vague, speculative, they're ambiguous. There's no specific adoptive admission and even if there is, it's, at most, confusing to the jury. Those conversations are excluded." The court also reaffirmed its earlier ruling allowing the prosecution to present evidence of the second pretext phone call that Patton made to Sissac.

1. *Admission of Sissac's statements during the second pretext phone call*

At trial, the recording of Patton's second pretext phone to Sissac, which started at 10:42 p.m. November 1, 2011, was played for the jury. Copies of the transcript of that phone call were handed out to the jurors. During that phone call, Patton told Sissac, "[I]t's . . . just fuckin' a stressful situation that I'm in right now," and Sissac replied that it

23

"ain't your situation to stress" and that "you just got to let it go." Patton asked, "[W]hat does God say to you, you know, like, what is this doin' for you?" Sissac eventually replied, "You know all sin is forgiven." Patton indicated that he might need to talk to Sissac's pastor, and stated that "I need to fuckin' get an appointment with his ass" because "he got you all kinds of calm." Responding that he had talked to his pastor, Sissac offered to take Patton to see him.

Sissac also told Patton during the pretext call that "everything happens for a reason. You know, this is just an eye opener . . . ." Shortly thereafter Patton said, "I don't want to look at you in a different light like that," and "that night, . . . I just didn't see Meech."[12] Patton added, "*To do some shit like that*, like *that's not my Nigga right there*." (Italics added.) Sissac responded, "*Yeah, it wasn't me*. You know? You gotta, you gotta, what you gotta see is *that was the devil . . . .*" (Italics added.) Patton then asked asked Sissac, "[D]id you . . . feel like the devil was in you?" Sissac replied, "Yeah. It was, I just—just fuckin' else that would do somethin' like that. *God wouldn't, wouldn't do nothing like that. He wouldn't put that in me.* [¶] . . . [¶] . . . *That was the devil*." (Italics added.) Patton also told Sissac, "[*T*]*his isn't* [*Sissac*] *that's doin' this. This is . . . somebody else inside of this dude*." (Italics added.) Sissac responded, "*Yeah*. [¶] . . . [¶] . . . I mean it's sad to say this had to happen but it will turn me around, you know, so . . . ." (Italics added.)

---

[12]    At trial Patton testified he knew Sissac as Meech.

Later during that recorded phone conversation, Patton asked Sissac whether he got "any money out of it." Sissac responded, "No, I didn't." Patton told Sissac that the "devil makes you do crazy things," and Sissac replied, "He does, and that's what you need to know." Patton said, "I don't never want to hear no shit like that. *I don't know who the fuck you was that night dog but don't ever be that person again*. You feel me? That's not you . . . ." (Italics added.) Sissac responded, "*Yeah*." (Italics added.) The phone call ended soon thereafter.

2. *Jury instructions*

The court instructed the jury regarding adoptive admissions under CALCRlM No. 357:

> "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in his presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

The court also instructed under CALCRlM No. 358 regarding evidence of a defendant's statements:

> "You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence in reaching your verdict. It is up to you

25

to decide how much importance to give to the statements. [¶] consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

B. *Adoptive Admission Exception to the Hearsay Rule* (§ *1221*)

Section 1221 codifies the adoptive admission exception to the hearsay rule and provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

The California Supreme Court has explained that, "[u]nder [section 1221], '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.' [Citation.] 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

26

C. *Analysis*

We reach the merits of Sissac's claim of prejudicial error notwithstanding the Attorney General's assertion that Sissac "has forfeited the instant claim."

Sissac contends his statements to Patton during the recorded pretext phone call were not adoptive admissions of guilt within the meaning of the adoptive admission exception to the hearsay rule because "they did not express any sort of adoptive admission of guilt and, to the extent one might be able to glean such an inference from them, the vagueness and ambiguity of the statements ultimately rendered them too confusing to be admitted for this purpose." In support of this contention, he asserts that the statements he and Patton made during the call "vaguely refer to 'this' or 'that' in describing the topic of [his] conversation[] [with Patton], leaving it simply unclear as to just what [he and Patton] were discussing."

Sissac's claims that his and Patton's references to "this" and "that" in describing the topic of their conversation rendered his statements "too confusing" to be admitted as adoptive admissions and that his statements to Patton "did not express any sort of adoptive admission of guilt," are unavailing. The evidence shows that Hamrah was shot during night time in the early morning hours of October 30, 2011, and Patton made his pretext call to Sissac at 10:42 p.m. at the direction of the police two nights later on November 1. During their phone conversation, Patton, in a statement accusing Sissac (whom he knew as Meech) of wrongdoing at night, said, "[*T*]*hat night*, I just didn't see Meech," and added, "To do *some shit* like that, like that's not, that's not my Nigga right there." Any rational jury could infer from Patton's accusatory statement, in light other

27

properly admitted evidence (discussed, *ante*) showing that Sissac shot Hamrah, that Patton was accusing Sissac of shooting Hamrah during the night of October 29-30, and that Sissac would have denied the accusation if it were not true. A rational jury also could infer that Sissac's response to Patton's accusation was an implied or adoptive admission of guilt. Sissac's responded to the accusation by telling Patton, "Yeah, it wasn't me. You know? You gotta, you gotta, what you gotta see is that was the devil . . . ." A rational jury could infer from this response that Sissac was expressing consciousness of guilt by impliedly admitting he committed the act, but "the devil" made him do it. We conclude that the evidence of the statements made by Sissac and Patton during the pretext call was relevant to the central factual issue of whether Sissac shot Hamrah, and that the court properly found that evidence was admissible under the adoptive admission exception to the hearsay rule codified in section 1221.

IV. *CLAIM THAT THE COURT ABUSED ITS DISCRETION BY ADMITTING IMPROPER LAY OPINIONS OF PATTON AND GLENN*

Sissac also claims the court prejudicially abused its discretion and violated his federal constitutional right to a jury trial by erroneously admitting improper lay opinion testimony by both Patton and Glenn on "the central factual and legal issues that *the jury* was to decide." Specifically, he asserts the court prejudicially erred (1) by allowing Patton to testify that the victim (Hamrah) was "innocent" and that what Sissac had done was a "sin," it was "wrong," and it was "murder"; and (2) by permitting Glenn to testify that Sissac "murder[ed]" the victim. Sissac also contends his trial counsel rendered

28

prejudicial ineffective assistance of counsel by failing to object to this testimony as improper opinions. Sissac's contentions are unavailing.

Sissac forfeited his claim of prejudicial evidentiary error by failing to object at trial to the foregoing testimony on the ground it constituted inadmissible lay opinion. section 353 precludes a party from complaining on appeal that evidence was inadmissible on a certain ground unless he or she made a timely and specific objection on that ground below. (§ 353, subd. (a).)[13] Here, the record shows that defense counsel did not object to any of the foregoing testimony on the ground that it constituted inadmissible lay opinion.

We reject Sissac's claim of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and, of particular importance here, (2) that the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, the defendant must show a reasonable probability he would have received a more favorable result had his counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) We conclude that, in light of the strong evidence of Sissac's guilt

---

13    Section 353, subdivision (a) provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

(discussed, *ante*) that does not include the lay opinion testimony challenged here, Sissac has failed to meet his burden of establishing a reasonable probability he would have achieved a more favorable result but for his counsel's failure to object to Patton's and Glenn's lay opinion testimony. We note that Sissac, in arguing he was prejudiced by his trial counsel's failure to properly object to this testimony, disregards the plethora of strong evidence of his guilt, which we incorporate by reference here.

## V. *CLAIM OF CUMULATIVE ERROR*

Last, Sissac contends the cumulative effect of all of the foregoing claimed evidentiary errors was prejudicial and warrants reversal of the judgment. We reject this contention.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) A defendant is "entitled to a fair trial but not a perfect one." (*Ibid.*)

Here, we have concluded that all of Sissac's claims of evidentiary error are unavailing because any errors that occurred were harmless, whether considered individually or collectively. Accordingly, we reject his claim of prejudicial cumulative error.

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.